CROWN MANUFACTURING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9450.   Promulgated May 21, 1928.

*R. Kemp Slaughter, Esq.,* and *H. C. Bickford, Esq.,* for the petitioner.
*A. R. Marrs, Esq.,* for the respondent.

38

40

OPINION.

PHILLIPS: The first question presented to us for determination is the value of the raw materials inventory of the petitioner on December 31, 1920. Petitioner's inventory was made up of both domestic and foreign cottons and domestic and foreign waste. The cotton is identified by symbols or marks indicating the type and grade of cotton. This inventory was prepared under the supervision of the general manager of the petitioner who purchased practically all of its cotton and who, therefore, knew the qualities of the cotton indicated by each mark. This inventory was also priced by him and although he had made no purchases during the latter part of the year 1920 and was somewhat out of touch with the market,. his testimony is that inventories were based upon quotations which he had received over a period of a week or two previous to the time the value was set. This witness had purchased all of the cotton of the petitioner since the year 1912 and, in consultation with the treasurer, had priced all of its inventories since that time. The inventory of raw materials so made by the petitioner was used by it in its income-tax return and was accepted as correct by the respondent. The petitioner claims that such inventory was overstated by some $75,000.

In support of its claim the petitioner offers the testimony of various dealers who had sold cotton to the petitioner of the various types included in the inventory. Each witness confined his testimony to his opinion of the value on December 31, 1920, of the particular cotton sold by him and bearing the descriptive mark used by him in selling such cotton. Apparently no two of such witnesses used the same marks for the same kind of cotton. No two dealers attempted to testify as to the value of any cotton bearing a particular mark; in other words, we have the expression of opinion of only one dealer as to the value of cotton identified by a particular mark or as a particular type.

The domestic cotton included in the petitioner's inventory is identified under 33 separate marks. The opinion expressed by the dealer in each particular type of such cotton compares with the value used in the petitioner's inventory as follows: In the case of 5 types the values are the same; in the case of 16 types it is 1 cent per pound less; in the case of 1 type it is 1½ cents less; in the case of 1 type it is 2 cents less; in the case of 1 type it is 3 cents less; in the case of 1 type it is 4 cents less; in the case of 1 type it is 2 cents more and in the case of another type it is 5 cents more. In the two cases where the values are 3 and 4 cents less, respectively, the opinion of the witness

is based upon a sale of comparable cotton on December 2, 1920. In that case where the opinion places the value 2 cents higher than used in the inventory, the witness based his opinion upon the price at which he could have sold cotton which had been offered to him by a southern shipper on December 31, 1920. The basis upon which the witness arrived at the value which is 5 cents in excess of that used by the petitioner does not appear. In three instances the testimony offered was that of a witness who was without sufficient familiarity with the cotton to express an opinion which is entitled to any weight and in three other instances no testimony of the value was offered.

· There is testimony by both the brokers and the general manager of the petitioner to the effect that at the close of 1920 the market for raw cotton was in a somewhat unsettled condition, the price of cotton having suffered a very serious decline during that year, commencing in the month of May. One of the brokers stated in substance that while the market price could be fixed within fairly definite limitations, various brokers would probably disagree as to the exact price; that their differences might reasonably amount to as much as one cent a pound in the better grades of cotton such as those used by the petitioner. In view of this testimony it is interesting to note that in only six instances did the price fixed by the opinion evidence vary more than one cent a pound from the price used by the petitioner in its inventory and accepted by the Commissioner. In two of those six cases the opinion of the witness was higher than that used by the petitioner. In the other four it was lower. In two of the four cases in which it was lower the opinion was based upon sales of comparable cotton made practically one month prior to the date when the inventory was prepared. It thus appears that in practically every instance where the opinion expressed by a witness is based upon satisfactory evidence of market value, the price placed by the petitioner upon its cotton falls within the limits of the difference in value indicated as reasonable by the testimony.

This inventory was priced at the time to which it relates by one who was familiar with the cotton which he was pricing and who was in a position to compare the respective values of similar cotton offered by different brokers under different marks. It bears internal evidence that the witness was in fairly close touch with the domestic market. Considering all of these factors it is our opinion that the inventory of domestic cotton as originally taken by the petitioner was more nearly correct than any which could now be arrived at on the basis of the testimony offered and that it should not be disturbed.

The situation with respect to the foreign cotton included in petitioner's raw cotton inventory is somewhat different from that of the

domestic cotton. The only witness who testified with respect to the cotton described as " sak " placed a value of 32 cents per pound, based upon a sale which took place on February 7, 1921. The evidence before us indicates that while cotton prices advanced somewhat in January, 1921, they suffered further declines in the latter part of that month and in February and that the price of cotton in February, 1921, was lower than it was in December, 1920. In such circumstances a December 31, 1920, market value equal to the price at which a sale was made some weeks later, seems to us unsatisfactory. The Egyptian and Peruvian cotton included in the inventory is valued by the witness at one cent less per pound than that fixed by the petitioner. The market for such cotton appears to have been very inactive and the difference between the value used by petitioner and that expressed by the witness falls within the realm in which differences in opinion seem reasonable. The greatest difference arises with respect to other values. The petitioner fixed a value of 19 cents per pound for its Mexican cotton while the witness fixed a value of 15 cents per pound. The witness testified that there had been no sales of such cotton to his knowledge since early in the year. He further testified that he had no knowledge of the type of such cotton purchased by the petitioner. The same witness testified that the same would be true with respect to the Haitian cotton which was inventoried by the petitioner at 21 cents per pound and upon which the witness placed a value of 13¾ cents per pound, stating that such value was arrived at by comparing Haitian cotton with Egyptian cotton, although at the same time stating that he had no knowledge of the type of Haitian cotton purchased by the petitioner. This witness expressed no opinion with respect to the value of San Domingo cotton but the general manager testified that it was substantially the same grade as Haitian and now values that cotton at 13¾ cents per pound.

The petitioner's general manager was thoroughly familiar with cotton and its various grades. The inventory made by him groups the Haitian, Peruvian, and San Domingen cottons under the grade of " Eg.," apparently indicating that in grade it was the equivalent of the Egyptian cotton and in the inventory it is priced the same as Egyptian cotton. On the other hand, the witness who was called upon to express an opinion of their value testified that he did not know the grade of such cotton which the petitioner had on hand but was testifying from his knowledge of the kind of cottons usually received from those countries. Considering the qualifications of the general manager, it seems reasonable to conclude that these foreign

cottons were equivalent in grade to the Egyptian cotton and should be valued as such. His conclusions in respect to such cottons seem to us to be entitled to more weight than those of the witness. After a careful consideration of the testimony with respect to such foreign cottons we feel that the values fixed by the petitioner in its inventory more nearly represent the true market values than those for which petitioner now contends.

Coming then to a consideration of the domestic and foreign waste, we find the opinion testimony to be no more than a guess. The witness had made no sales or purchases which might be used as a basis for fixing value and testified that there was no market; that any price was too high. He places values of 8 and 9 cents a pound on the waste. The nearest transaction of which he had knowledge was a purchase by him of similar waste at 8¼ cents per pound on May 27, 1921. Cotton prices were lower at that time than at the end of December, 1920. The witness sold this particular purchase at that time at a profit.

This testimony impresses us as being no more than a guess as to market value. The witness was without any basis to determine a market at that date. In the absence of any market, intrinsic value is frequently used. The general manager of the petitioner was as well qualified, if not better, than was this witness, to judge the intrinsic value of the waste. He could compare its value to petitioner with the value of other cottons and arrive at a conclusion which should be acceptable in the absence of any satisfactory proof of a market value. We are satisfied that the evidence does not justify us in disturbing the values used by petitioner in its inventory of waste.

The second issue presented by the parties is the valuation of petitioner's inventory of goods in process and finished goods on December 31, 1920. The Revenue Act of 1918, in section 203, provides that whenever inventories are necessary they shall be taken upon such basis as the Commissioner, with the approval of the Secretary, may prescribe. Pursuant to such authority the Commissioner, with the approval of the Secretary, promulgated regulations to the effect that inventories should be valued at either (a) cost, or (b) cost or market whichever is lower, such basis to be applied with reasonable consistency to the entire inventory. Such regulations, as amended by Treasury Decision 3296, contained an exception in the case of goods which were the subject of firm sales contracts. This regulation as amended provides:

Under ordinary circumstances, and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which ordinarily purchased by

the taxpayer, and is applicable in the cases (*a*) of goods purchased and on hand, and (*b*) of basic elements of cost (materials, labor, and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process for delivery on firm sales contracts (i. e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, which goods must be inventoried at cost.

The parties are in agreement as to the method upon which the cost or market value of the inventory is to be computed. They are at odds as to what portion of the inventory of finished goods or goods in process is to be taken at cost, because covered by firm sales contracts, and what portion is to be taken at market. They also differ as to whether in computing the inventory at market, effect should be given to a reduction in wages which took place shortly prior to December 31, 1920. Upon the latter question we entertain no doubt that in arriving at the market value of such goods the item of labor should go into the computation at the prices prevailing at the close of the year. We see no difference between this and any other item entering into the computation.

It was customary for the petitioner to take orders in advance for a specified number of pounds of yarn to be delivered as specified in the contract. The pertinent part of a typical contract reads as follows:

Quantity 50,000 Lbs.
Count 18's, 32's, 36's, 38's, 40's, 45's, 50's, 55's, 60's, in 2, 3, or 4 ply.
Description: Combed Sak. Yarn. Reverse thread skeins.
Prices Below:
Shipments 2000 Lbs. weekly beginning early April 1920.
Note:—Customer not to specify less than 2000 Lbs. of a count at any one time.
Shipping Directions to be forwarded later.

| Prices: | | | | | |
|---|---|---|---|---|---|
| 18/1 | $1.32 | 36/3 | $1.67 | 45/3 | $1.89 |
| 18/2 | 1.42 | 38/3 | 1.71 | 50/3 | 1.96 |
| 32/3 | 1.59 | 40/3 | 1.76 | 55/3 | 2.08 |
| | | | | 60/3 | 2.21 |

Under this form of blanket contract the purchaser had the option of purchasing any of the yarns specified at the prices stated and in advance of such specifications it was impossible for the petitioner to set aside any particular yarn for such order. It was customary for the petitioner, however, to manufacture yarns in advance of receiving specifications and to place such yarns in stock. These yarns might later be used to fill such blanket orders or might be used in fillings orders subsequently received or in making immediate delivery of new purchases.

On December 31, 1920, the petitioner had on hand 522,812 pounds of goods either in process or finished. At the same date it had on hand unfilled blanket orders for 230,376 pounds of yarn. Of this

quantity, 103,023 pounds were covered by specifications received prior to January 1, 1921. On the balance of the orders the petitioner had not received any specifications and it was impossible for it to determine what yarns would be required under the balance of such contracts.

In determining the deficiency the Commissioner valued all of the inventory of goods in process and finished goods at cost on the theory that they were covered by firm sales contracts. This is now admitted by the respondent to be error. His counsel now contends that 230,376 pounds of this inventory should be valued at cost because covered by firm sales contracts. Petitioner concedes that 103,023 pounds were covered by firm sales contracts and should be valued at cost. The difference between the parties is with respect to 127,353 pounds, being the amount covered by contracts on which the petitioner had not yet received specifications.

The evidence establishes that prior to the receipt of specifications it was impossible to determine what size and quantities of yarn would be required for unfilled portions of the contracts and that neither the goods in process nor finished goods could be allocated to any particular order until specifications were received. Prior to the receipt of specification petitioner could not know whether any of the goods which were manufactured or in process of manufacture would be the particular kind of yarn which would be specified for delivery on the outstanding orders. Under this state of facts it seems clear that only that portion of the inventory which was covered by contracts on which specifications had been received on December 31, 1920, can be said to be on hand for delivery on firm sales contracts. These yarns came within the exception laid down in Commissioner's regulations to the general rule that inventories are to be taken upon the basis of cost or cost or market whichever is lower  Those goods which were finished or in process of manufacture, which might or might not be assigned later to any existing contract, and which were available for any orders which might be received, did not fall within the exception but fall within the general rule and should be valued at market, which was lower than cost. We are therefore of the opinion that 103,023 pounds of finished yarn in the inventory should be valued at cost and the balance of the finished yarns and the yarns in process should be valued at market.

All of the factors on which the petitioner's inventory of finished goods and goods in process may be computed upon the basis indicated, are in the record. The method to be followed is not in dispute. The proper computations should be made by the parties and submitted by them at or prior to the date of recomputation of the deficiency under Rule 50. At the same time the parties may file

requests for additional findings of fact upon this issue, which shall embody the result of such computations, setting out the market value of so much of this portion of petitioner's inventory as is based upon market values and the cost of so much of petitioner's inventory as is based upon cost.

There is much evidence in the record with respect to depreciation, all of which has been considered. Petitioner claims a normal rate of depreciation of 5.96 per cent of cost of machinery for normal day time operation and asks that this be increased proportionately for overtime operation of the plant. It must be recognized that there is no method by which depreciation may be computed to the ultimate penny. All we can hope is to arrive at a fairly accurate allowance in the light of all the circumstances. Here we believe that an allowance in each of the years of 7 per cent of cost is proper.

*Decision will be entered under Rule 50.*