S. Weisbart and Company, a dissolved Colorado corporation v. Commissioner.
S. Weisbart & Co. v. Commissioner
Docket No. 84329.
United States Tax Court
T.C. Memo 1964-130; 1964 Tax Ct. Memo LEXIS 205; 23 T.C.M. (CCH) 788; T.C.M. (RIA) 64130; May 8, 1964
*205 Petitioner, a cattle raiser, valued its inventories at cost or market, whichever is lower. To identify the animals in its closing inventories petitioner used a modified FIFO method. Held, petitioner's inventory method is acceptable. Held, further, petitioner is entitled to value its 1952 and 1955 closing cattle inventories at market value, having shown that market value was lower than cost for both years. Market value of inventories determined. Value of property transferred, in redemption of stock in minority shareholder, determined. Ellis J. Sobol and Leslie H. Wald, Tower Bldg., Denver, Colo., for the petitioner. Richard J. Shipley, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioner's *206 income tax as follows: FY Ending
Deficiency
10-31-51
$760,441.15
10-31-54
2,836.28
10-31-55
279,002.85
The issues here presented are: (1) Whether petitioner's cattle inventories of October 31, 1952, and October 31, 1955, should be written down from cost, under the lower of cost or market method, and if so, by what amount; (2) Whether petitioner is entitled to an unused excess profits credit carry-back from its fiscal year ending October 31, 1952, to its fiscal year ending October 31, 1951; and (3) The correct amount of cost to be transferred to petitioner's treasury stock account on the redemption by petitioner during the fiscal year ending October 31, 1955, of the stock of Jack Boxer, a minority stockholder. Other issues have been conceded by both parties, necessitating a Rule 50 computation. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. During the taxable years ending October 31, 1951, 1952, 1953, 1954 and 1955 petitioner was a corporation existing under the laws of the State of Colorado. It was dissolved on December 31, 1957, and the petition herein was verified for the petitioner by persons having authority *207 to do so under applicable Colorado law. Petitioner was incorporated June 1, 1947, continuing in corporate form a business which had been operating as a partnership under the same name. Petitioner kept its books and filed its Federal corporate income and excess profits tax returns on a fiscal year beginning November 1 and ending October 31, on the accrual method of accouting. In its initial return, for the period ending October 31, 1947, petitioner indicated its election to value inventories on the basis of the lower of cost or market. Petitioner filed its income and excess profits tax returns for the years involved with the district director of internal revenue, Denver, Colorado. Petitioner and its predecessor partnership were in the business of buying and fattening cattle for slaughter as beef cattle. Petitioner did not breed cattle nor did it slaughter cattle. Petitioner sold its cattle principally to packing houses. Petitioner's operations were widespread. It owned a ranch of approximately 64,000 acres in Wyoming and a ranch of approximately 1,000 acres in Morgan County, Colorado. Petitioner leased summer and winter pasture lands in Colorado, Kansas, Montana and Texas and *208 in addition, placed cattle under the care of others. In 1955 petitioner also owned cattle located in Nebraska and Oklahoma, as well as the above-mentioned states. Petitioner maintained a feedlot in Brush, Colorado, about 80 or 90 miles from Denver, which would accommodate between 22,000 to 30,000 head of cattle. Here petitioner performed the final fattening (finishing) of its cattle for sale as slaughter animals. Purchases of cattle included in the October 31, 1952, inventory were made for petitioner both by its officers and principal stockholders and by commission agents in Colorado, Texas, Nebraska, Oklahoma, Missouri, Wyoming, New Mexico and Kansas, and purchases of cattle included in the October 31, 1955, inventory were made in Colorado, Texas, Oregon, Nebraska, Oklahoma, Idaho, Arizona, New Mexico, Montana, Wyoming, Kansas, South Dakota, Missouri and Nevada. During its fiscal years 1951 through 1955, petitioner was engaged in buying cattle of various ages, from calves to mature animals, feeding them in many instances on pasture and roughage feeds, finishing all animals by a concentrated grain feeding in a feedlot until they were fat, and then selling them on the slaughter *209 cattle market. Many of the heavier cattle acquired were placed directly in the feedlot without preliminary pasture or roughage feeding. Petitioner purchased many different types, weights, and classes of cattle. During the fiscal year ended October 31, 1952, petitioner made total cattle purchases of $10,279,397.57 and total feed purchases of $4,656,179.36. During the fiscal year ended October 31, 1955, the petitioner made total cattle purchases of $5,792,741.76 and total feed purchases of $4,598,725.40. As of October 31, 1952, according to a physical count, petitioner had 29,599 head of cattle in inventory. Of this number 22,474 head were in the feedlot, 6,170 head were on pasture in the area of Brush, Colorado, 706 head were in transit, and 186 head were in the stockyards at Brush, Colorado. As of October 31, 1955, according to a physical count, petitioner had 41,089 head of cattle in inventory. Of this number 27,306 head were in the feedlot, 580 head were in transit and 13,203 head were on pasture and on farms in Colorado, Oklahoma, Texas, Montana and Nebraska. The cattle-feeding operation of petitioner differed from most other beef-raising and cattle-feeding operations during *210 the years in question in that petitioner bought cattle of all ages, types and weights and not only fed them in a feedlot but also grazed cattle on summer and winter pastures. In effect petitioner combined three distinct types of cattle operations (feeding on grass, feeding on roughage, and feeding in the feedlot). The lighter weight ("green") cattle were put out on pasture, while the heavier cattle went directly into the feedlot for final finishing. Also, buyers would often select only certain cattle from a given pen in the feedlot, after which petitioner's employees would transfer the remaining animals to different pens. Due to the constant sorting of cattle and the large scale operations of petitioner, precise identification of animals was extremely impractical. The petitioner chose a fiscal year ending October 31 because in the fall of the year cattle normally would be moved off pasture and into the feedlot. At this time of your petitioner would have the greatest number of cattle in the feedlots and the fewest number of fat cattle (cattle ready for sale) on hand. Cattle coming into petitioner's feedlots were first fed on roughage, such as corn ensilage and green hay, and a small *211 amount of grain. Gradually over a 10- to 14-day period the amount of grain was increased until the cattle were on a so-called "high-ration' grain diet. The daily cost of early feeding in the feedlot was much cheaper than the later feeding. Because grain is relatively expensive, a commercial feeder, who buys all of his feed for the cattle in the feedlot, as contrasted with a farmer feeder who raises some or all of his feed, is more interested in fattening and selling his cattle in as short a period as possible. Petitioner and its predecessor, for each fiscal year commencing in 1946, made a count of cattle on hand on inventory date. During the years in issue a physical count was taken and was certified to by petitioner's certified public accountant, Sam Butler (hereinafter sometimes referred to as Butler), who went into the feedlot to observe the taking of the count. Petitioner's tax returns for the taxable years or periods ending October 31, 1947, 1948 and 1949 were examined in 1950 by an internal revenue agent who proposed adjustments to the amounts of cattle inventories reported by petitioner. Petitioner had computed the value of these inventories under what it called an average *212 cost method, based on certain selected purchases which were deemed typical or average. The agent proposed to determine the cost of these inventories by application of a strict average cost method. When petitioner objected to this method the agent computed the values under a first-in, first-out method to which he made several adjustments. Petitioner agreed in principle with the revenue agent's use of a modified first-in, first-out method, but objected to the agent's application of that method. Petitioner requested an informal conference with the field conferee, and several conferences were held in December 1950 and in 1951. The field conferee disagreed with the agent's approach and computed petitioner's inventories on a strict first-in, first-out basis. Petitioner protested the findings of the field conferee to what is now the Appellate Division in February 1952. The case was finally settled sometime in 1953 or 1954 at a unit cost figure midway between the proposals of petitioner and the revenue agent. Subsequent to the revenue agent's 1950 examination, petitioner calculated the cost value of its cattle inventory on October 31, 1950, under a method of identifying the animals in *213 inventory which it has called modified first-in-first-out. This method is sometimes hereinafter referred to as modified FIFO. Thereafter, petitioner used the same modified FIFO method of identifying animals and determining cost for its cattle inventories on October 31, 1951 through 1957, and on January 1, 1958, the day following petitioner's dissolution and liquidation. The modified FIFO method devised by Butler is based upon the physical count of cattle on hand at the inventory date, both those on pasture and those in the feedlots. Petitioner also had available the purchase invoices showing when each group of cattle was acquired and the average weight of the animals in each group when acquired. Butler divided the cattle into four weight classifications, and on the assumption that the lightest weight animals would be held the longest time, determined which invoices pertained to the cattle on hand at the inventory date. The following schedule was used as a basis for these calculations: On hand if acquired dur-
ing the following
Purchase
months before
Weight
inventory
Under 500 lbs.
15 months
500-650 lbs.
4 months, possibly 5 or 6
650-850 lbs.
2 months, possibly 3 or 4
Over 850 lbs.
1 month, possibly 2
*214 Where doubt existed as to which animals were on hand, an officer of petitioner would consider factors such as place of origin, weight, feed, weather conditions and possible sickness in a herd, and determine whether or not a particular animal was on hand on the inventory date. These situations involved the cattle referred to in the above schedule as "possibly" on hand. Under the modified FIFO method, petitioner determined that the following numbers of animals in the respective weight classes, and acquired in the months indicated, comprised the closing inventories of its fiscal years 1952 and 1955: 1952
Weight Class When Purchased
Under
Over
Month Acquired
500 lbs.
500-650 lbs.
650-850 lbs.
850 lbs.
Oct. 1952
2,266
2,736
5,043
1,363
Sept. 1952
18
677
744
2,748
Aug. 1952
177
667
1,361
July 1952
102
1,070
June 1952
64
May 1952
52
April 1952
66
Nov. 1951 to Mar. 1952
1,867
Oct. 1951
5,675
Sept. 1951
1,046
Aug. 1951
1,284
1955
Oct. 1955
1,214
3,102
1,819
2,156
Sept. 1955
57
1,967
1,357
315
Aug. 1955
203
959
769
July 1955
1,729
1,206
June 1955
2,529
1,640
May 1955
5,400
1,166
Adjustment [1]
(4,050)
(2,235)
Nov. 1, 1954 to Apr. 30,
1955
12,098
Oct. 1954
5,016
Sept. 1954
2,517
Aug. 1954
155
*215 The data developed by petitioner through application of its modified FIFO method included the date of each purchase invoice for cattle included in inventory on October 31, 1952 and 1955, the place of purchase, the supplier, the number of head, the sex of the animal if known, the invoice weights, and the basic invoice costs. Commencing with its closing inventory for the fiscal year ending October 31, 1950, and until the liquidation of petitioner on January 1, 1958, petitioner computed the cost of its inventories by arriving at an identification of cattle on hand, and the purchase price of those cattle, by the modified FIFO method. Petitioner then added together the purchase price of cattle on hand and the estimated costs of pasture, feed and freight attributable to the cattle on hand. The amounts thus computed for its 1952 and 1955 fiscal years are as follows: 1952
Basic Invoice cost
$4,493,172.48
Feed in cattle
795,793.23
Pasture
228,458.52
Freight
62,157.90
$5,579,582.13
1955
Basic invoice cost
$3,585,355.48
Feed in cattle
626,319.00
Pasture
368,176.18
Freight
86,286.90
$4,666,137.56 [2]
*216 For its 1952 and 1955 fiscal year closing inventories petitioner computed the lower of cost or market value by a "component parts" method; that is, by comparing the cost and the market values of the various component parts of the cattle in inventory. Petitioner used this method in an attempt to follow as closely as possible its technique in arriving at cost. Its computations were as follows: 1952
Cattle (per invoices)
$3,089,788.81
Feed in cattle
431,751.00
Pasture
228,458.52
Freight
62,157.90
$3,812,156.23
1955
Cattle (per invoices)
$2,757,991.95
Feed in cattle
375,932.81
Pasture
368,176.18
Freight
86,286.90
$3,588,387.84
Petitioner presented at trial computations of replacement market values of its inventories using various markets. Replacement for these purposes was defined as what it would cost to replace the inventory on inventory date by purchases on the market in the quantities in which petitioner normally bought. In order to calculate the Denver replacement market amounts, petitioner used the invoices representing cattle in inventory *217 on October 31, 1952 and 1955 according to its modified FIFO method. Petitioner calculated the weights of those cattle on the inventory dates and applied the Denver livestock market prices for stockers and feeders as reported by the USDA, using the choice grade slaughter cattle prices for cattle determined to be fat or nearly fat. Petitioner compared the cost of cattle as computed for its income tax returns, with the market value of the same cattle, and took the lower of the two. The total lower of cost or market thus computed with reference to the Denver livestock market prices was $4,083,149.93 for October 31, 1952, and $3,870,197.19 for October 31, 1955. According to its modified FIFO calculations petitioner determined that its Texas purchases comprised 36 percent of its closing 1952 inventory and 41 percent of its closing 1955 inventory, and that other than its Oklahoma purchases in 1952 which comprised 23.5 percent of its purchases in that year, no other market purchases represented more than 15 percent of the inventory cattle in either year. To compute a Texas replacement market petitioner used the Fort Worth livestock market because it considered that that market represented *218 the type of cattle it was purchasing in Texas, although most of petitioner's Texas purchases were made in the Panhandle, between Ft. Worth and Denver, and none were made in Ft. Worth. The total lower of cost or market thus computed with reference to the Ft. Worth livestock market prices was $4,063,228.47 for October 31, 1952, and $3,967,000.2.20 for October 31, 1955. Petitioner also computed replacement market figures by applying average prices shown by purchase invoices for purchases made during the last week in October and the first three weeks in November in 1952 and 1955, to the cattle in each weight classification. These amounts included the estimated freight costs for the cattle. Petitioner took into account the time lags on contract sales in determining which invoices represented purchases made on or about the inventory date. The total lower of cost or market thus computed with reference to petitioner's purchases made around the inventory date, including freight to Brush, Colorado, was $4,169,399.79 for October 31, 1952, and $4,618,917.84 for October 31, 1955. Petitioner also computed the lower of cost or market values of its inventory for October 31, 1952, based on all *219 of its November 1952 purchases except purchases made under contracts entered into prior to inventory date. The value thus computed was $4,231,467.61. For the 1952 and 1955 fiscal years, respondent determined that the market values of petitioner's closing cattle inventory was not less than $5,579,582.13 and $4,666,117.56, [3] amounts identical to the cost figures reported by petitioner. Petitioner reported a feed and cattle inventory of $4,103,688.76 as of November 1, 1950, a cattle inventory of $5,665,518.14 as of November 1, 1951, and a cattle inventory of $4,686,991.47 as of November 1, 1954; these items were not challenged by respondent and the amounts thereof have not been put in issue in this case. Since its inception petitioner has computed the cost value of its closing cattle inventories without including administrative or overhead costs. It is not normal or custommary practice of cattle feeders in this area to include such costs in their cattle inventories. To compute the cost of feed attributable to cattle in the feedlot petitioner first determined from its records the number of cattle that had entered the feedlot during the months preceding *220 the inventory date. Then the number of days each animal had been in the feedlot was calculated by assuming, as a matter of convenience, that each had entered the feedlot on the 15th of any given month. The number of days all cattle were in the feedlot was then multiplied by the average cost of feeding an animal per day to arrive at the total feed cost attributable to the cattle in the feedlot on the inventory date. Petitioner determined pasture costs attributable to the cattle in closing inventory by subtracting from total pasture costs the amount determined to be attributable to cattle which had been sold during the year. The amounts thus determined to be attributable to cattle in the 1952 and 1955 closing inventories were $228,458.52 and $368,176.18, respectively. In determining the freight cost to be added to the cost values of its 1952 and 1955 closing inventories, petitioner used an estimated amount of $2.10 per head. Exact computation of freight costs attributable to inventory cattle was difficult since petitioner had to take into consideration certain "fabrication-in-transit" credits received from the railroads. These credits are based upon the amount of weight shipped *221 in to petitioner by rail, and could be applied to outgoing shipments. These credits could be utilized only when petitioner made a shipment to a point where the credit applied. In computing the market value of its cattle inventories, petitioner applied the following market prices, which it based upon its purchases on the Denver livestock market and on the current quotations on that market: October 31, 1952
Weight Classes
Under
Over
Type
500 lbs.
500-650 lbs.
650-850 lbs.
850 lbs.
Steers
$20.00
$14.75
$16.25
$17.75
Heifers
20.00
14.75
16.75
17.50
Mixed
20.00
14.75
16.50
17.63
October 31, 1955
Steers
$16.75
$13.25
$13.25
$13.25
Heifers
14.25
11.75
11.75
11.75
During petitioner's 1952 fiscal year, cattle market prices declined substantially. The average prices paid for feeder and stock steers on eight markets [4] declined from a high of $32 per cwt. during November 1951 to slightly over $23 per cwt. during October 1952. The largest break in the market came between May 1952 and July 1952, when the average fell from $31 to $25. Petitioner's records indicate that the two principal sources of the cattle *222 on hand for its October 1952 inventory were Texas and Oklahoma. Also, petitioner bought large quantities of cattle directly from rancher-producers, through commission agents, rather than at the public markets used by the USDA in compiling the above statistics. Delivery of these purchases was not immediate, unlike those made at sale barns of public markets. Invoices bore the date of delivery, but the price would be agreed upon at the time of purchase. The time gap between these two dates was often from seven days to three months. On February 2, 1953, petitioner executed a chattel mortgage on 20,305 head of its feedlot cattle to the First National Bank of Denver, in connection with a bank loan. The mortgage also covered enough feed to fatten the cattle for 90 days. On January 29, 1953, petitioner's officers had furnished to the bank a signed valuation of these cattle, listing the number of head, sex, breed, age, brand, weight, and estimated value per head. The estimated per head values, when converted to a weight basis, reflect *223 values of $20 to $25.25 per cwt. Petitioner's evaluation, together with a report by the bank's inspectors, was used by the bank to assure that adequate collateral would be given for the $1,750,000 short-term loan applied for by petitioner. The estimated value of the cattle securing the loan was $4,760,080. On July 30, 1955, petitioner prepared an inventory and valuation of its cattle for the purpose of a settlement whereby all of the stock of Jack Boxer (sometimes hereinafter referred to as Boxer), a minority shareholder, was to be redeemed. The settlement was to become effective on September 1, 1955. The cattle inventory on that date was 38,838 head, of which 18,147 were in the feedlots. Of the feedlot cattle, 9,818 were classified as "long fed" and the remainder were classified as "short fed." The long-fed cattle were those where the feedlot-entry date indicated that most had been there from four to six months. The dates on the short-fed animals indicated they had been on feed from one to three months. The cattle in this inventory were valued for purposes of the settlement at a fair market value arrived at as a result of negotiations between the parties. The long-fed cattle were *224 valued at between $20.50 and 22.25 per cwt. The short-fed cattle were valued at between $15 and $17 per cwt. Sick cattle were valued at $90 per head. The valuation of the short-fed animals was based on the medium grade feeder and stocker market, and the valuation of the long-fed animals was based on the fat cattle market. The average feeder and stocker prices paid on ten midwestern and western markets during the months of July and October 1955 were each approximately $17.45 per cwt. The Denver market slaughter cattle prices for the week ended November 4, 1955, were an average of about $.50 to $1 per cwt. lower than for the week ended July 30, 1955. Of the 38,838 cattle in inventory at the time of the inventory taken for the Boxer settlement, 20,691 were on pasture. Petitioner valued the pasture cattle as follows: No. Head
Value per Cwt.
4,288
$14.00
13,784
16.00
350
17.00
616
15.50
1,275 heifers
Not valued
378
90.00 each These values indicate that petitioner valued most of these cattle in the common to medium range. The USDA establishes grades for slaughter cattle. These grades depend on such factors as the conformation of the carcass, the amount of *225 fat or marbling in the meat, and the texture and color of the meat. Consistently throughout the years 1952 and 1955 petitioner sold its cattle at choice slaughter grades. The average weight gain of petitioner's cattle while on pasture was approximately one pound per day during 1952 and 1955. The average weight gain of petitioner's cattle while in the feedlots was approximately two pounds per day in 1952 and approximately 2.25 pounds in 1955. During its fiscal year 1952, petitioner purchased cattle as indicated below: Number of head by weight class
Under
Over
Month
500 lbs.
500-650 lbs.
650-850 lbs.
850 lbs.
Nov. 1951 to May
1952
1,985
3,117
4,937
5,490
June 1952
64
192
155
70
July 1952
102
1,070
1,326
999
August 1952
175
641
1,651
1,731
September 1952
20
703
796
3,185
October 1952
2,266
2,736
5,043
1,363
Total
4,612
8,459
13,908
12,838 Petitioner also purchased 8,569 head during the year for speculative purposes. These are not included in the above totals. During its fiscal year 1955, petitioner purchased cattle as indicated below: Number of head by weight class
Under
Over
Month
500 lbs.
500-650 lbs.
650-850 lbs.
850 lbs.
Nov. 1954 to May
1955
17,498
5,040
5,852
1,328
June 1955
2,529
1,640
224
18
July 1955
1,729
1,206
684
26
August 1955
203
959
3,457
503
September 1955
57
2,240
1,084
4,030
October 1955
1,641
3,770
1,875
2,471
Total
23,657
14,855
13,176
8,376
Less Boxer cattle
(4,050)
(2,235)
19,597
12,620
13,176
8,376
*226 The market values of petitioner's October 31, 1952, and 1955, cattle inventories were $4,355,223 and $3,945,000, respectively. During 1955, petitioner redeemed all of its stock held by Boxer, a minority (20.6 percent) stockholder. The consideration given by petitioner consisted of cash, a promissory note, cancellation of Boxer's indebtedness to petitioner, and other assets including petitioner's Wyoming ranch and 6,285 head of cattle. The cattle included 2,235 feedlot animals and 4,050 pasture animals. The agreement between Boxer and petitioner for redemption of Boxer's stock provided that Boxer was not to be charged any amount for feeding the cattle in the feedlot until the date he took possession. The cost of pasture in connection with cattle at other locations and the expenses of the Wyoming ranch to be transferred to Boxer were to be Boxer's expenses from and after September 1, 1955. Boxer took possession of the feedlot cattle on September 9, 1955. Petitioner computed its cost of the cattle transferred to Boxer and adjusted this amount out of its asset accounts and assigned it to treasury stock. The cost of the cattle was computed as follows: 4,050 head on grass
$291,033.30
2,225 head in feedlot [5]
166,991.50
Total cattle cost
$458,024.80
Pasture and feed
10,930.50
Total
$468,955.30
*227 Respondent, in the statutory notice of deficiency, determined that the cost assigned by petitioner to the cattle transferred to Boxer was understated by $137,153.90. The amount of cost to be allocated to the cattle transferred to Boxer is as follows: Pasture (grass) cattle
$289,906.59
Feedlot cattle
169,348.65
Pasturage costs
14,867.98
Fred Costs
70,476.00
Freight
12,058.80
Indirect Costs
5,587.50
$562,245.70
Opinion During 1952 there was a substantial decline in the market prices for stocker and feeder cattle on the mid-western and western markets. The main inquiry in this case is into the loss in value, if any, of petitioner's inventory due to this market decline, based on petitioner's valuation of its inventories at cost or market, whichever is lower. Underlying this is the question of the validity of petitioner's use of its modified FIFO method of identifying the animals on hand at inventory date. Petitioner on its income tax return for its fiscal year ending October 31, 1952, reported *228 a cost of $5,579,582.13 and a market value of $3,812,156.23 for its closing cattle inventory. In his statutory notice of deficiency respondent stated: It is determined that the cost value of your cattle inventory as at October 31, 1952 in an amount of not less than $5,579,582.13 more clearly reflects your income than does the value used by you on your income tax return of $3,812,156.23. Accordingly, your taxable income is increased in the amount of $1,767,425.90. The closing inventory valuation involved here directly affects petitioner's cost of goods sold, and hence its income. Cost of goods sold is equal to opening inventory, plus purchases, minus closing inventory. Therefore, a higher value of closing inventory will decrease the cost of goods sold and increase income. The first issue to be decided is when petitioner would suffer a loss in market value, for inventory purposes, from the 1952 market declines. Petitioner contends that it suffered a loss in its 1952 fiscal year. Respondent contends that the loss, if any, was suffered in petitioner's 1953 fiscal year. We agree with petitioner. It is respondent's contention that petitioner did not suffer a "real" loss on its cattle *229 inventory until its 1953 fiscal year, and has failed to support its reduction of inventory value for its 1952 fiscal year. Respondent bases this conclusion on the fact that petitioner's resale market did not decline sharply until its 1953 fiscal year. Respondent states: This is in line with theory of the lower of cost or market value which is to recognize losses which have been suffered but not to provide for losses which are not in fact anticipated. D. Loveman & Son Export Corp., (1960) 34 T.C. 776, 798. Respondent's use of D. Loveman & Son Export Corporation, 34 T.C. 776 (1960), which was affirmed on appeal (296 F. 2d 732 (C.A. 6, 1962)), is inapposite and out of context. In the portion of Loveman referred to by respondent, the losses "not in fact anticipated" related to that petitioner's use of major steel mill prices when those markets were inaccessible to petitioner. In holding that those markets could not be used for the computation of lower of cost or market, we pointed out that since petitioner could not replace its inventory from these sources, it could not reduce its inventory values to these market prices. We did not say that *230 it could not have reduced its cost figures to the prices on the market upon which it would actually have replaced its goods. The "unanticipated" nature of the loss in Loveman refers to the difference between the major mill prices and the prices which petitioner would have paid on the markets where it could purchase its replacement inventory. To construe our statement in Loveman to refer to resale market as respondent would have us do would deny a reduction to market value in every situation where resale price was greater than cost and would nullify the entire accounting concept of lower of cost or market. The lower of cost or market method is one instance where the tax law permits the deduction of an unrealized loss, and is a recognized exception to the necessity of reflecting in income tax returns only closed transactions. As we said in Loveman: Whatever the defects of the lower of cost-or-market method in actual practice, its underlying theory, as stated in Finney and Miller, Principles of Accounting (Intermediate) (5th ed. 1958), is as follows (p. 251): The cost-or-market basis of inventory pricing conforms with an old rule of accounting conservatism often stated as follows: *231 Anticipate no profit and provide for all possible losses. If market purchase prices decline, it is assumed that selling prices will decline with them; reducing the inventory valuation to market purchase price reduces the profit of the period when the cost price decline took place and transfers the goods to the next period at a price which will presumably permit the earning of a normal gross profit on their sale. If the market purchase price increases, the inventory is valued at cost so that a profit will not be anticipated. The evidence introduced by both parties established that there was a substantial decline in petitioner's purchase market values during its 1952 fiscal year. We must compare the purchase market values with the cost of the cattle in petitioner's 1952 fiscal year closing inventory. If respondent's disallowance of petitioner's market value computations is based upon a contention that there was no such decline, it is clearly incorrect. Respondent's alternative contention is that petitioner's modified FIFO method is unacceptable. It is incumbent upon petitioner to establish the validity of its method of valuation in order to provide a means of ascertaining the proper *232 value of its inventories, and to show that the market decline reduced the market value of its inventories below its cost. It is respondent's contention that he has accepted petitioner's cost figure for purposes of computing lower of cost or market without accepting the method by which this figure was arrived at by petitioner, and that petitioner has failed to show that market value was any lower than this amount. Respondent then proceeds to argue that the modified FIFO method used by petitioner is unacceptable under the pertinent statute and regulations, and may not be used by petitioner for computing the market value of its closing inventory. Respondent specifically states that he is not attempting to change petitioner's cost figures for either closing or opening inventory for its 1952 fiscal year but that he is merely disputing petitioner's computation of market value for closing inventory. Despite respondent's disclaimer, petitioner maintains that respondent's use of petitioner's cost figures results in an acceptance of its modified FIFO method, upon which such figures are based. Petitioner argues that, if respondent has stipulated to the number of cattle in closing inventory *233 and also accepted petitioner's cost figures, then an acceptance of the modified FIFO method of identification is implicit. We cannot agree. Respondent has consistently objected to the modified FIFO method. While the use of petitioner's cost figures in the statutory notice of deficiency might have been an arbitrary attempt by respondent to determine a value for petitioner's inventory, there is no basis for construing this action as an acquiescence to petitioner's modified FIFO method. There is merit, however, in petitioner's objection to respondent's attempt to impeach petitioner's modified FIFO method for purposes of market value only, despite the fact that it is also the basis of petitioner's cost figures. By arguing that the modified FIFO method is inaccurate and that petitioner has not established that the market value was not below petitioner's cost amount, respondent attempts to use this amount as an inflexible ceiling. This overlooks several aspects of an inventory valuation. The cattle inventory valuations in this case are part of the computations necessary to determine petitioner's cost of goods sold, and ultimately, petitioner's income. Once it has been established that *234 petitioner's cattle inventory decreased in value because of the market declines, the question that remains is whether the resulting values were less than petitioner's cost for these animals, and if so, by how much. In order that there be no distortion of income, if closing inventory is adjusted, a corresponding adjustment must be made to opening inventory. Fruehauf Trailer Co., 42 T.C. 83 (April 13, 1964); The Thomas Shoe Co., 1 B.T.A. 124 (1924); Boyne City Lumber Co., 7 B.T.A. 36 (1927); Justus & Parker Co., 13 B.T.A. 127 (1928). If petitioner's modified FIFO method is inaccurate, adjustments must be made to both opening and closing inventory costs, as well as to market value, since all of these computations are dependent upon this method. If petitioner's modified FIFO method is an improper method of inventory identification, as contended by respondent, then all of petitioner's computations would have to be revised. Section 22(c) of the 1939 *235 Code [6] provides two tests which an inventory valuation must meet: (1) it must conform as nearly as may be to the best accounting practice in the trade or business, and (2) it must clearly reflect income. Petitioner contends that it has met these requirements, and has complied with respondent's regulations as well. Respondent's regulations provide, in part, that greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with the regulations under section 22(c). [7] Petitioner has consistently valued its inventories at cost or market, whichever is lower, and since its 1950 fiscal year, inventory values have been based upon its modified FIFO method of identification. Until its 1952 fiscal year market value had never been lower than cost, so that petitioner valued its inventory at cost for each fiscal year prior to 1952. The aspect of consistency in inventory valuation helps to assure a clear reflection of income in each accounting period. *236 Petitioner's inventory method involves at least three distinct steps. First, modified FIFO is used to identify which animals are on hand at inventory date. Second, cost and market values are arrived at for the cattle identified under modified FIFO. Third, under lower of cost or market, the lower of the two amounts is selected for use in assigning a value to the identified cattle. The main thrust of respondent's argument is an attack on petitioner's modified FIFO method of identification. Respondent contends that this method, although used consistently by petitioner, is based upon too many estimates, is inaccurate, and is internally inconsistent. The modified FIFO method was instituted by petitioner's accountant, Butler, because it was impractical to round up and weigh the cattle on hand at inventory date, due to (1) the extremely large area over which the cattle were situated, (2) the cost and difficulty of transportation to weighing stations, and (3) the weight loss which would be incurred by interrupting the feeding process. An actual physical count was taken to determine how many cattle were on hand. To determine the identity of these cattle, Butler divided purchase invoices *237 into four categories according to weight at time of purchase. He then used an estimated average daily gain of one pound for pasture feeding and two pounds for feedlot feeding, to ascertain how many months an animal in each weight category would be on hand before being sold. Where there was doubt as to whether particular invoice purchases were still on hand at inventory date, Butler and petitioner's officers would consider various factors and decide whether or not to include them in inventory. The invoices representing the cattle determined to be in inventory were then used as the basis for the cost and market values of the purchased animals. Respondent's position, as manifested by the field conferee, is that petitioner cannot properly identify the animals in its inventory and must, therefore, use a strict FIFO method. See section 39.22(c)-2, Regs. 118. [8] We find that the modified FIFO method does provide a reasonable identification of the animals in inventory and is in accord with the theory of inventory valuation. In view of the manifold differences in weight and dates of acquisitions made by petitioner, the use of a straight FIFO method would cause a distortion of income far greater *238 than any which would be caused by petitioner's application of its modified FIFO method. The value of inventories under straight FIFO would depend largely on the weight of animals purchased close to inventory date each year. Methods of inventory are frequently modified to suit sets of unusual circumstances. See E. Rauh & Sons Fertilizer Co., 12 B.T.A. 468 (1928), and cases cited therein. Where experienced persons, well acquainted with market conditions and prices, modify the usual inventory methods, their calculations are often accorded substantial weight in the absence of contradictory indications that these calculations are inaccurate. See E. Rauh & Sons Fertilizer Co., supra; Crown Manufacturing Co., 12 B.T.A. 37 (1928); Justus & Parker Co., supra.
*239 Petitioner's consistent use of the modified FIFO method resulted in a reasonably accurate identification of the animals in inventory. It is not necessary that petitioner's inventories be absolutely accurate or correct. As used in the pertinent Code sections, "clearly" to reflect income means plainly, honestly, straightforwardly and frankly, not accurately, precisely, exactly, correctly, or without error or defect. Huntington Securities Corporation v. Busey, 112 F. 2d 368, 370 (C.A. 6, 1940). We are satisfied that petitioner's modified FIFO method provides a reasonable basis for clearly reflecting income, and is in accord with the best inventory accounting practices. Petitioner has amply documented its computations and has consistently applied its method during the years in question. It is not necessary for petitioner to value each animal; a separation into groups according to weight provides a sufficient basis for valuations. See e.g., S. G. Sample Co. v. Commissioner, 23 F. 2d 671, 672 (C.A. 5, 1928), remanding 5 B.T.A. 1034 (1927). Wood & Ewer Co. v. Ham, 14 F. 2d 995 (N.D. Me., 1926); Klein Chocolate Co., 32 T.C. 437 (1959), *240 supplemental findings and opinion 36 T.C. 142 (1961). This is not a situation where a taxpayer has made an arbitrary percentage reduction of cost based upon an estimate of overall market decline. Cf. Coon Auto Co. v. Commissioner, 35 F. 2d 504 (C.A. 8, 1929), affirming 8 B.T.A. 763 (1927); O. A. Steiner Tire Co., 9 B.T.A. 1289 (1928). The weight categories chosen by petitioner are similar to those used by the USDA in its listings of market prices. The purchase invoice weights were used to determine into which category given animals should be placed, and a computation of market value can be easily made by applying the market prices for each weight group. In order to determine which animals were no longer on hand at inventory date because they had reached slaughter weight and been sold, petitioner estimated that the average slaughter weights varied from 900 pounds for heifers to 1200 or 1300 pounds for steers, with the usual average slaughter weight for steers being in the 1100 to 1200 bracket and for heifers, in the 900 to 1000 bracket. From its experience, petitioner had calculated that the average daily weight gain of cattle *241 in the feedlot was two pounds. Respondent has attempted to show that the average daily weight gain of feedlot cattle was less than two pounds. The experience of respondent's witnesses was mainly with smaller or experimental operations, and we accept petitioner's calculation as correct, since it has been amply supported by the testimony and records. Respondent maintains that even if we accept petitioner's figure of two pounds per day of feedlot weight gain, the feedlot periods used by petitioner in its modified FIFO computations are too short. Respondent contends that petitioner could not have fattened its cattle to slaughter weight in the periods it had estimated, and that by using shorter feedlot periods to the inventory cattle petitioner understated their weights at inventory date. Because the average weight gain on pasture was one pound per day rather than the two pounds per day gained in the feedlot, a determination that the inventory cattle entered the feedlots later than they actually did, would materially increase their weight at inventory date. For example, even a one-day shortening of the feedlot period for each animal would decrease the weight of the herd by almost 30,000 *242 pounds. At the 1952 market prices this would lower market value by approximately $5,000. We are aware, as petitioner maintains, that there is a great variance in weight gains and slaughter weights even within a given weight group, but in using any sort of average, we find that the lengths of time which petitioner ascribed to its feedlot period are materially shorter than a feedlot weight gain of two pounds per day would justify. We agree with respondent that a weight gain of two pounds per day is inconsistent with petitioner's calculations of the periods required to fatten its cattle to slaughter weight. This inconsistency does not invalidate the modified FIFO principle, but it does point out a flaw in its application. The only reasonable explanation which we have been able to arrive at is that petitioner's cattle entered the feedlots at an catrher time than petitioner has calculated under modified FIFO, and that petitioner's average feedlot weight gain of two pounds [*] day is inaccurate when applied only to there cattle in closing inventory. The earlier entry of cattle into the feedlots would increase their weight at inventory date by substituting feedlot gain for pasture gain, *243 and would partially explain the relatively short period of time in which some cattle were deemed to have reached slaughter weight before inventory date under modified FIFO. This also results in an increase in the total weight of those animals remaining in closing inventory. The application of the two pound per day feedlot weight gain to the animals in closing inventory also appears to be incorrect. Though an animal may average two pounds per day over the entire feedlot period, the gain is not an even one. The greatest daily feedlot weight gains take place during the earlier part of the feedlot operation, while the period during which an animal approaches slaughter weight an animal approaches slaughter weight produces the lowest daily feedlot gains. Since a large number of the animals still in inventory had not reached the final stages of the feeding process, they would have gained more than the two pounds per day average used under modified FIFO. This results in an increase in the overall weights of these animals at inventory date. The parties have not presented us with sufficient evidence to come to an exact calculation of the amount of additional weight to be added to the cattle *244 in closing inventory because of the above observations as to why the weight gains and feedlot periods are inconsistent; but based upon the record before us and using our best estimate, we have increased the weight of the cattle in closing inventory by an average of 60 pounds each. In doing so, we bear most heavily on petitioner whose figures are inconsistent and who has not come forward with sufficient evidence to support completely its burden of proof in this connection. In computing the market value of its closing inventory, petitioner used what it termed a "component parts" method to calculate the market value of the four items which comprised the basic elements of its inventory costs. Section 39.22(c)-4, Regs. 118, provides, in part, that: Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer * * * The use by petitioner of its "component parts" method is most closely similar to a "reproductive cost" computation, *245 whereby goods which have not reached a form salable on the open market are valued at the current bid price for the preceding salable form plus the necessary labor and burden of bringing the goods to their form on inventory date. The use of this method by petitioner was improper, as is tacitly admitted by petitioner on brief. Without passing on the general acceptability of this method, we need only point out that petitioner was not a "manufacturer," cf. Bedford Mills v. U.S., 75 Ct. Cl. 412, 59 F. 2d 263 (1932), motion for new trial overruled, 2 F. Supp. 769 (1933), and at all times had a marketable product. There was, therefore, a readily available gauge for the calculation of market value, i.e., the replacement market, where petitioner would have purchased replacements for the cattle in inventory. This is the proper criterion for market value. D. Loveman & Son Export Corporation, supra. The purpose of requiring the use of "reproductive cost" is to provide a substitute gauge for market value where there are no available market prices for goods as found in inventory. At all relevant times there were market quotations for cattle at various *246 stages of development, so that resort to a "reproductive market" calculation was both unnecessary and incorrect. Petitioner's consistent use of its "component parts" method is not sufficient to make this an acceptable method in these circumstances. As alternative valuations to its "component parts" figures at trial, petitioner submitted replacement market computations to establish the value of its cattle on several different markets. Each computation was based upon the same cattle, i.e., those identified under modified FIFO. Each computation indicated that the replacement of those cattle at the various market prices would cost less than the amounts paid by petitioner on its original invoices. This is strong corroboration for petitioner's contention that the market value of its 1952 closing inventory was lower than cost, and that petitioner did suffer a loss in value which would entitle it to write down closing inventory from cost to market. Accepting the fact that market value was lower than cost, there remain two further inquiries. First, which replacement market should be used? Second, should the slaughter cattle market or the stocker and feeder market prices be used? In its *247 original computations, petitioner employed the USDA Denver market prices. On brief, however, petitioner contends that the replacement market value of its inventory would be most clearly reflected if the USDA Ft. Worth market prices were used. Petitioner points out that the largest number of its 1952 fiscal year purchases were made in Texas, and that the types of cattle sold on the Ft. Worth market were most representative of the types petitioner was purchasing. Respondent contends that the use of the Ft. Worth market is not justified and "because of the widespread nature of petitioner's purchases the correct market for valuation (assuming any sort of valuation can properly be made) is the market most centrally located, the Denver market." As an alternative respondent suggests the use of the USDA average prices on eight western and midwestern markets. Respondent admits that petitioner's purchases on the Denver market were not a major part of its total purchases and "were not representative of the quality of petitioner's cattle generally," but concludes that "still this market is probably as satisfactory a basis for valuation as anything available." We cannot agree. Respondent objects *248 to petitioner's use of the Ft. Worth market because of "the widespread nature of petitioner's purchases" and then goes on to select Denver because it is the market "most centrally located." The only plausible interpretation of this statement is that Denver is the major market closest to petitioner's feedlot operations, in Brush, Colorado. However, the advantage of not having to adjust market prices for freight and shrinkage differentials does not outweigh the advantage of obtaining a more accurate "replacement" of petitioner's inventory animals. The fact that petitioner, in the exercise of its business judgment, found it to be more profitable to make more of its purchases in the Ft. Worth market area than in any other area, such as Denver, indicates to us that additional freight costs and shrinkage were more than compensated for by the Ft. Worth purchase prices. Respondent's alternative suggestion that certain USDA averages be used to determine replacement market is likewise less satisfactory than petitioner's use of the Ft. Worth market prices. This average figure has no correlation to the volume, quality or markets of petitioner's purchases. Petitioner made no purchases on some *249 of the markets, only a few on others, and bought predominantly lower grades than those used in the USDA averages. See E. T. Bamert, 8 B.T.A. 1099 (1927); D. Loveman & Son Export Corporation, supra. Petitioner contends that, since it made more purchases in Texas than in any other state, the Ft. Worth market prices would most clearly reflect the replacement market value of its inventories. If only one market were to be used, Ft. Worth probably would be the most logical choice, but because many of petitioner's purchases were not made at the public markets, and because the majority of its purchases were made in states other than Texas, we have used a weighted average of several market prices to arrive at a valuation. Since the Ft. Worth market prices were substantially lower in October 1952 than most of the other markets where petitioner would "replace" its inventory, the use of only the Ft. Worth market prices would understate the replacement market value of its entire inventory. We have taken into account the fact that the Ft. Worth market prices would reflect the type of cattle purchased by petitioner for a large percentage of its inventory, but that petitioner *250 would make many other "replacement" purchases elsewhere. The issue of what grade animals comprised the bulk of petitioner's inventory was the subject of much testimony. Witnesses called by respondent testified that as a general rule cattle feeders consider that they can upgrade cattle about one grade and that petitioner's consistent sale of finished animals at choice slaughter grade prices indicated that it fed medium to good stocker and feeder animals. Petitioner's witnesses testified that its cattle were predominantly common to medium grade stockers and feeders. The lines of demarcation between common, medium and good cattle are not sharp and definite. There is a certain amount of overlapping and much of the classification is left to individual discretion. As a general rule, the longer and more effective the feeding process, the higher an animal will ultimately grade. We are persuaded by the testimony of petitioner's witnesses that the bulk of its cattle purchases were of common to medium grade. These witnesses included some of petitioner's competitors, its employees, and other ranchers with a great deal of experience with cattle and a familiarity with petitioner's operations. *251 The testimony of respondent's principal witnesses related to smaller feeding operations and academic experiments. These witnesses had little personal knowledge of petitioner's large commercial operation, and much of their testimony, while obviously sincere, is of far less probative value in our inquiry than that of petitioner's witnesses. Smaller cattle feeders had to depend to a far greater degree on the appearance of their animals than did petitioner, whose reputation for grade and yield was well established. Therefore, the market prices we have used for all except fat or very nearly fat cattle are those for common to medium stockers and feeders. Fat or very nearly fat cattle have been valued at the market prices for choice grade slaughter cattle, as petitioner has done in its original computations. We have also considered, but reject as not probative of the grade of petitioner's 1952 closing inventory cattle, the valuation statement submitted by petitioner in connection with a bank loan in February 1953. The purpose of this statement was to assure that adequate collateral would be given for the loan, not to accurately reflect the value of petitioner's inventory, and the value of *252 the collateral given was well in excess of the amount loaned even if the cattle were valued at lower grades. Respondent objects to petitioner's use of a $2.10 per head figure to represent its freight costs rather than its actual freight cost each year. Petitioner has consistently used this figure for freight costs. While a more accurate computation might be made by subtracting fabrication-in-transit credits during the year from actual freight costs from purchase points to Brush, Colorado, we are satisfied that petitioner's consistent use of the $2.10 figure is reasonable and does not distort its income. There is no indication that any adjustment of opening and closing inventories to reflect actual freight costs would not offset each other since the number of cattle in each group was approximately the same. Taking into account the above factors, we conclude that the market value of petitioner's closing inventory for its 1952 fiscal year was $4,355.223. The extent to which petitioner is entitled to an unused excess profits credit carryback adjustment will be calculated under section 432(c)(1) of the Internal Revenue Code of 1939. [9]
*253 For its 1955 fiscal year petitioner also reported its closing cattle inventory at market value after determining by its modified FIFO method that market value was less than cost. The decline in market prices of stocker and feeder cattle during this time was less substantial than in 1952. Petitioner reported a market value of $3,588,387.84 but respondent determined that petitioner's cost figure of $4,666,117.56 more clearly reflected its income. Respondent's position here is similar to his position with regard to the 1952 fiscal year, i.e., that market value was not lower than cost, that modified FIFO is an unacceptable method, and that in any event petitioner has failed to show that market value was lower than cost. On its tax returns petitioner used its "component parts" and modified FIFO methods to compute cost and market value. At trial petitioner presented alternative computations based upon several replacement markets. These computations corroborate petitioner's contention that market value of its closing cattle inventory was lower than cost. In dealing with petitioner's 1952 fiscal year inventories we have discussed the arguments of both parties. That discussion is equally *254 applicable here. [10] We approve of petitioner's use of its modified FIFO method and, using replacement markets similar in principle to those used for the 1952 fiscal year, we determine petitioner's 1955 fiscal year closing inventory to have had a market value of $3,945,000. In arriving at this figure, we have considered that according to its modified FIFO identification petitioner purchased a slightly higher percentage of its cattle in Texas than in 1952 and purchased animals on markets in which petitioner had not dealt in 1952. Also, petitioner was feeding a higher grade animal in 1955 than in 1952, and had raised the weight gains of its animals from two to two and one-quarter pounds per day in the feedlots. Our other calculations are similar to those used for petitioner's 1952 fiscal year closing inventory. In 1955 petitioner redeemed the stock of Jack Boxer, a minority stockholder, for cash, cancellation *255 of indebtedness, and various assets. Included in these assets were 6,285 head of cattle (five of which were dead but were charged to Boxer in the settlement). To reflect the transfer of these cattle, petitioner removed the amount of $468,955.30 from its asset account and assigned it to treasury stock. Respondent determined that petitioner understated its cost of these cattle by $137,153.90. The issue to be decided is the proper amount allocable to the cattle transferred, so that petitioner's cost of goods sold in its 1955 fiscal year may be determined. On brief petitioner concedes that it did not transfer a large enough amount properly to reflect the cost of feed, pasture and freight, but maintains that its computation of invoice costs of the cattle was substantially accurate. Respondent contends that despite testimony by petitioner's witnesses and various records, that many of the feedlot cattle did not come from the sources specified by petitioner. While there are some cattle which are not specifically accounted for by petitioner's records, we are persuaded by the testimony and records as a whole that the computations made with regard to the purchase prices of the cattle transferred *256 to Boxer, as corrected on brief by petitioner, are reasonably accurate. In connection with its concession that the pasture and feed costs allocated to these cattle were understated, petitioner has submitted revised computations of these amounts. These figures reflect longer pasture periods and costs attributable to petitioner's Wyoming ranch, and result in an increase in pasture costs of $10,639.48. We accept this amount as an accurate calculation of the pasture costs attributable to the cattle transferred to Boxer. We arrive at a similar conclusion with regard to feed costs, as increased by petitioner on brief by $63,774. Petitioner has not included any amount for indirect costs attributable to the Boxer cattle. Such costs must also be added. The consistency of petitioner's exclusion of such costs from its inventory is irrelevant here, since we are dealing with a determination of the over-all cost of assets transferred, not petitioner's annual inventory valuation where the cost of goods sold during the year depends partially upon the difference in opening and closing inventories. Indirect costs of the Wyoming ranch have been already included in the costs that are applicable to *257 contract cattle under the care of others. An adjustment for the remaining 2,235 head at $2.50 per head (an amount estimated by petitioner's accountant and not challenged by respondent) results in a further increase in the cost of cattle transferred to Boxer of $5,587.50. The amount of freight costs attributable to the transferred cattle must also be recomputed. Petitioner did not include freight costs for the feedlot animals and for 1313 head on pasture around Brush, and used its $2.10 per head figure as the freight cost for the remainder of the cattle. As with indirect costs, the consistent use of the $2.10 figure is not relevant here. As part of its alternative computations of closing inventory petitioner arrived at an average actual freight cost of $3.09, taking into account freight credits. This figure includes the entire year's freight costs and credits. We recognize that, as petitioner contends, most of the cattle transferred to Boxer were lighter than the average cattle shipped by petitioner, making average freight costs lower on these cattle than on the total inventory purchases. Therefore, we have lowered the $3.09 figure and have calculated the attributable freight costs *258 at a rate of $2.90 per head. Freight costs of $2.10 per head were included in petitioner's original figures for 2937 cattle, so that the total additional freight costs are $12,058.80. Thus, we have found the total cost of the cattle transferred to Boxer to be $562,245.70. Decision will be entered under Rule 50. Footnotes
1. Distribution of cattle in redemption of the stock of Jack Boxer, a minority shareholder, to be discussed infra.↩
2. Because of an arithmetic error this total was erroneously stipulated to be $4,666,117.56.↩
3. See footnote 2.↩
4. Based upon U.S. Department of Agriculture (USDA) reports for Chicago, Omaha, Kansas City, St. Paul, Sioux City, Denver, Ft. Worth and Oklahoma City.↩
5. On brief, petitioner states that a mechanical error was made in the feedlot figures. The number of cattle should be 2,235 and the cost should be increased to $167,066.25.↩
6. SEC. 22. [I.R.C. 1939] GROSS INCOME. * * *
(c) Inventories. - Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. ↩
7. § 39.22(c)-2. [Regs. 118] Valuation of inventories. * * *
(b) It follows, therefore, that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with these regulations. An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income.↩
8. § 39.22(c)-2. Valuation of inventories. * * *
(d) * * * Goods taken in the inventory which have been so intermingled that they cannot be identified with specific invoices will be deemed to be the goods most recently purchased or produced, and the cost thereof will be the actual cost of the goods purchased or produced during the period in which the quantity of goods in the inventory has been acquired. * * *↩
9. SEC. 432. UNUSED EXCESS PROFITS CREDIT ADJUSTMENT. * * *
(c) Amount of Carry-Back and Carry-Over. - (1) Unused excess profits credit carry-back. - If for any taxable year beginning after July 1, 1950, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carryback for the preceding taxable year.↩
10. The inventory provisions of the 1954 Code and Regulations are substantially the same as those of the 1939 Code and Regulations. These provisions have existed and continued without substantial change since the Revenue Act of 1918 and Regulations 45, promulgated thereto.↩